HALLIDAY *vs.* McDOUGALL and others.

*General reputation of a partnership,* existing between two or more individuals, standing alone and not offered in corroboration of facts and circumstances, is inadmissible in evidence to prove a partnership. Whether it be admissible, even as auxiliary evidence, *quere.*

A bill of exchange drawn in one state of the union upon persons residing in another, is to be treated as a *foreign bill,* and a *protest,* apparently under the seal of a *notary public,* made in the state where the drawees reside, need only be produced, and *proves itself* as to the *presentment* and *refusal* ; and so also, *it seems,* as to the transmission of *notice* to the parties on the bill, if such fact be stated in the protest.

Where the notary is *dead,* a sworn copy of the protest taken from his record book of notarial protests, together with the original protest, is abundant evidence of the presentment and refusal.

In an action against several as partners, although but one of the defendants be brought into court, if he appear and plead the *general issue,* the plaintiff is not entitled to recover, unless he establish a *joint liability* of the defendants.

ERROR from the superior court of the city of New-York. Halliday brought an action of assumpsit against *J. D. Ansley, J. McDougall* and *W. J. Wightman* as copartners, transacting business under the name of *Ansley, McDougall & Co.* The declaration contained a count on a bill of exchange bearing date 26th November, 1825, drawn *at New-York* by the defendants on a firm transacting business *at Charleston, S. C.* under the name of *J. D. Ansley & Co.* for the sum of $750, payable to the plaintiff or order at thirty days after sight. The bill was *accepted* by the drawees, but when it came to maturity, it was *protested* for non-payment, of which due notice was given. There was a similar count on a *second* bill of exchange of the same date between the same parties, for the same sum, payable forty days after sight, which was also protested and notice given. Then followed the usual *money counts.* McDougall alone being arrested, appeared and pleaded the *general issue.* On the trial of the cause, it was proved that the name of the firm of *Ansley, McDougall & Co.,* subscribed to the bills as *drawers,* was in the handwriting of *J. D. Ansley,* and the name of the firm of *J. D. Ansley & Co.,* subscribed to the bills as *acceptors,* was in the handwriting of

*W. J. Wightman.* The plaintiff produced two papers, purporting to be the *original protests* of the bills declared upon, signed by Thomas Morris, *notary public,* at Charleston—one on the 14th and the other on the 24th January, 1826—to which was affixed his notarial seal, and in which he certified that he had made demand of payment, that the same had been refused, and that he gave due notice of the non-payment of the bill and acceptance to the drawers and respective endorsers thereof. D. Alley, a clerk in the U. S. Branch Bank in New-York, testified that the protests produced in evidence were received at the Branch Bank in New-York from the Branch in Charleston ; that *Thomas Morris* was for many years *notary* of the United States Branch Bank, in Charleston, and the Branch in New-York had for many years received his notarial protests from the Branch in Charleston ; they had received hundreds of them, which all passed through his hands as clerk of the New-York Branch. The signature of Mr. Morris, as protesting notary, was recognized, and payments made under them ; he thus acquired a knowledge of Mr. Morris' handwriting, though he never saw him write ; and that he believed the signature to the protests produced to be his handwriting. A deposition of a son of Mr. Morris was read, in which he testified that his father died in 1828 ; that he was a clerk in his father's office; that the record-books of *notarial protests* of bills and notes formerly belonging to his father, are in the possession of the Branch Bank of the United States in Charleston, where they are kept as records ; that he finds in such books the record of protests of two bills of exchange, which he has transcribed and transmits, (being copies of the *original protests* verified by Mr. Alley ;) that it was the invariable custom of his father to send notice of protest to the endorsers of protested notes by the first mail succeeding the protest. The bills had been discounted at the Branch Bank in New-York, and on being returned protested, were paid by the plaintiff. Two of the defendants, viz. *Ansley* and *Wightman,* were members of the firm at Charleston. In July 1825, *Ansley* was in England, and there entered into an agreement in writing with *McDougall,* the other defendant in these words :

Halliday *v.* McDougall.

"We engage to allow Mr. McDougall one fourth the profits of our trade by his becoming an active partner, or give him the option of having his expenses paid out and home. Should Mr. McDougall not be satisfied with his proportion of the profits arising out of the said concern, we shall allow him a salary of $1200 per annum. Liverpool, 16th July, 1825. (Signed) *John D. Ansley & Co.*" In pursuance of this agreement, *McDougall* came to this country. Ansley had put up a *sign* at his place of business, of *Ansley, McDougall & Co.*, and previous to the arrival of McDougall here, it was generally reported that he had become a member of the firm of *Ansley, McDougall & Co.* After his arrival, he acted as a member of that firm ; but as to his being a member of the firm of *J. D. Ansley & Co.* at Charleston, there was no evidence independent of reputation. In relation to *Wightman* being a member of the firm of *Ansley, McDougall & Co.*, there was no evidence whatever, other than reputation. When the plaintiff rested, the defendants' counsel moved for a non-suit, on the ground that there was no evidence that *Wightman* was a member of the firm of *Ansley, McDougall & Co.* The motion for a non-suit was denied. When the proofs were closed, the defendants' counsel renewed the objection, and requested the judge to charge the jury that the plaintiff could not recover, unless they were satisfied that he had shown that *Wightman* was a partner in the firm of *Ansley, McDougall & Co.*, and *that general reputation was not alone sufficient to establish such fact.* On the *subject of general reputation*, all that was said in the charge to the jury was the following : " If the jury should not be satisfied that *McDougall* elected to become a partner, then they were to find upon the evidence whether he held himself out, or knowingly suffered himself to be held out by others, as a partner, in such a manner as to induce the world to believe he was such a partner. If he did so, then he was bound as a partner by the acts of the firm to all persons, except such as might know that in fact he was not a partner. The jury, however, in considering the evidence on this head, must carefully lay out of view the acts or declarations of *Ansley*, or of any other person, before the arri-

val of McDougall in the country, *and also the reputation on the subject of the partnership prevailing before that time.*" The judge further charged the jury, that before the plaintiff could recover, they must be satisfied that *all the defendants were partners* in the firm of *Ansley, McDougall & Co.* The jury found for the plaintiff. The defendants' counsel having excepted to various decisions made in the progress of the trial, and to the charge of the judge, sued out a writ of error.

*D. D. Field,* for the plaintiff in error.

*J. W. Gerard,* for the defendant in error.

*By the Court,* Cowen, J.    Assuming that all three of these defendants were members both of the *New-York firm* which drew in favor of the plaintiff, and the *Charleston firm* which accepted, the action is completely sustained against the defendants as acceptors.    No presentment and notice were necessary.    It is true, there is no count against them specifically as such ; and this was made an objection on the trial ; but the claim in the latter form is admissible under the common counts—a proposition so plain, that an objection for variance at the trial, and which has found its way into the bill of exceptions, is not now persisted in.

If the members of the New-York firm were not also members of the firm at Charleston, the defendants must be charged, if at all, as *drawers ;* and this view raises the question of presentment and notice.    In the latter view, we think the case presents no difficulty.    This being a draft, the drawers and drawees of which resided in different states of the union, is a foreign bill of exchange. *Bucknor* v. *Finley,* 2 *Pet. R.* 586, 590.    *Lonsdale* v. *Brown,* 4 *Wash. C. C. R.* 148, *per Washington, J. ;* 2 *Pet. R.* 688, *app. S. C.; Townsley* v. *Sumrall,* 2 *Pet. R.* 170.    *Cape Fear Bank* v. *Stinemetz,* 1 *Hill,* 44.    *Brown* v. *Ferguson,* 4 *Leigh,* 37.    And *per Nelson, J. in Wells* v. *Whitehead,* 15 *Wendell,* 530.    The protest of the foreign notary, therefore, proved itself, and its contents are to be received as true.    *Chitty on Bills, ed. of* 1836, *p.*

Halliday *v.* McDougall.

642, *a.* *and cases there cited.* *Townsley* v. *Sumrall,* 2 *Pet.* R. 170. *Cape Fear Bank* v. *Stinemetz,* 1 *Hill,* 44. *Per Story, J. in Nicholls* v. *Webb,* 8 *Wheat.* 331. Clearly, this is so as to the presentment and refusal. *Id.* It is said, however, that notice is not the official business of the notary, and therefore, though that be stated in the body of the protest, the statement cannot be taken as evidence *per se.* This may be so, though certainly it is his usual course to give the notice, and is in practice esteemed his duty ; so much so that I question whether he would not be accountable for the omission, on simple proof of the note coming to his hands as notary. The protest generally states, I presume, that notice was given. Such was the form in *Cape Fear Bank* v. *Stinemetz,* and I see no other evidence in that case of notice. It seems to have been assumed by the counsel that if the protest were avaliable for the presentment and refusal, it was equally so for the notice ; and Johnson, J. said expressly, " the protest is evidence of demand and *notice* to the drawer or endorser." 1 *Hill,* 45. Such too is the form in *Nicholls* v. *Webb.*

But suppose this to be otherwise, the notary was dead ; and the protests here each contained a memorandum of *notice* as well as presentment. It appears both in the notary's record book and in the original. The book was, I think, sufficiently proved, and the memorandum of notice was sufficiently specific ; as much so as that in *Nicholls* v. *Webb,* 8 *Wheat.* 326. It is said the record was not an original. This is of course so. A memorandum is not the original notice. But it is original as a memorandum, and receivable, whether made by the notary himself or his clerk. In *McNeill* v. *Elam, Peck,* 268, the notary's daughter was his clerk, and made the entries on his representation, and proved her father's habits of business. The entries were received to show notice. The clerk who made the entries testified to them, and so does the clerk here. *Wilber* v. *Selden,* 6 *Cowen,* 164.

But the original protest was well enough proved. That, in the view we are now taking, contained another memorandum of notice. Both were a kind of attestation made doubtless about

the same time, to keep the transaction alive.    The original pro-
test comes in the notary's own handwriting, provided Alley's
testimony was competent evidence.    He had long been a clerk
in the bank, and received and acted as agent of the bank on a
great many such protests.    This is, at least, equivalent to an
ordinary correspondence by letters acted upon, *Johnson* v.
*Daverne*, 19 *Johns. R.* 134, which it is not denied qualifies the
receiver of the letters to give an opinion in court as to the
handwriting of his correspondent.    *Vide State* v. *Allen*, 1
*Hawks*, 6; *Greaves* v. *Hunter*, 2 *Carr. & Payne*, 477.    *Vide
also* 2 *R. S.* 212; *also* 8 *Price*, 653.    Beside all this we have
the promises of two of the alleged members of the firm, made
after presentment, to pay the plaintiff's claim.    This may be
taken as aiding the presumption, at least, that due notice had
been given.    The general weight of authority is, as remarked
by Chancellor Kent, that a promise to pay is alone sufficient
evidence of notice, 3 *Kent's Comm.* 113, *and the cases there
cited;* though in this state the balance is the other way.    See
the cases summed up by Savage, Ch. J. in *Jones* v. *Savage*, 6
*Wendell*, 660, 661.    In the case at bar, however, if the origi-
nal protest as such were entirely out of the way : and taking
this to have been an *inland bill*, we have the strongest possible
circumstantial proof of every thing necessary to charge the
drawers.    *Vide Doe, ex dem. Patteshall*, v. *Turford*, 3 *Barn. &
Adolph.* 890.    Thus far we have gone on the assumption that
all three of the defendants were actually or constructively, for
the purposes of this paper, identified either with one or both
firms ; and it is not denied that this fact is essential to the plain-
tiff's claim.    He must establish it against all three jointly, the
same as if they were all on the record and had pleaded the
general issue.    That plea by McDougall alone is equivalent to
the same plea by each.    Was the case sustained according to
this requisition of the law ?

Most of the questions of fact were, it is not denied, properly
left to the jury.    Some of these were, whether *McDougall* was
a member of the *New-York firm;* and if so, whether the bills

were issued by *Ansley* for the benefit of *Ansley & Co.*, or of himself alone, with the knowledge of the plaintiff; and if so, whether *McDougall* assented to their being issued. It is said that the plaintiff having given evidence that they were issued for the benefit of *Ansley & Co.*, and endeavored to show both firms the same, he must prove that *McDougall* was a member of that firm, and could not otherwise recover. Not so. His being a member of the firm which drew, was enough to bind him if he assented, even though the plaintiff knew that the money was not going to the benefit of McDougall's firm, but to a stranger. By express assent, he gave the plaintiff the benefit of his name to the paper and cannot gainsay it. The judge accordingly left it to the jury to say whether *McDougall* was a member of the firm of *Ansley & Co.*, at Charleston; and also, whether *Wightman* was a member of the firm of *Ansley, McDougall & Co.*, in New-York. The first fact was essential to charge the defendant McDougall as acceptor; the last as drawer. A joint cause of action was to be made out against all three, whether they were to be regarded as drawers or acceptors. There was abundant evidence to connect *Ansley* and *McDougall* as members of the New-York firm, and enough to implicate *Ansley* and *Wightman* as members of the Charleston firm. But to connect all these defendants in both or either, there is nothing in the evidence, that I can find, *except general reputation;* and that, for aught that appears, never coming to the ears of either *McDougall* or *Wightman.* Let us first look at *Ansley & Co.*, the acceptors at *Charleston.* It is true *McDougall* came from Liverpool under an agreement with that firm to serve them as clerk, or act with them as a partner. He finds on his arrival a partnership sign at New-York, "*Ansley, McDougall & Co.*," and adopts it and goes on in that name. *Non constat,* unless by flying reports, that he ever agreed with *Wightman* that his (W.'s) name should make one of the firm here. *Ansley* had no power that we hear of, to take in a partner with *Wightman.* That he was himself connected as such certainly gave him no power. His signing the name of *Ansley & Co.*, to the proposition of partnership in

Europe, could therefore have no effect in itself; nor could his agreement on returning to New-York. He and *McDougall* afterwards discontinued their sign and went to Charleston ; but that could have been for no other purpose than to close up the business of the old firm there. A few days after their arrival, *Ansley* and *Wightman* alone issued a public notice of dissolution.

But if the jury concluded, as I think they must have done, that *McDougall* had no part in the concern at Charleston, the defendants were not acceptors ; and the chief justice then leaves to them the alternative, whether *Wightman* was not a member of *Ansley, McDougall & Co.*, the drawers. In this point of view, he tells them correctly, that " before the plaintiff could recover, they must be satisfied that all the defendants were partners in the firm of *Ansley, McDougall & Co.*" The question of Wightman's connection with that firm was contested at every stage of the trial. At the close of the plaintiff's case, on his resting, the defendant moved for a non-suit, because there was not sufficient evidence to charge *Wightman* as a member of *Ansley, McDougall & Co.*; and there was no evidence to show that he was in fact a partner there, or ever held himself out as such. At the close of the whole testimony, the judge is requested to charge that *general reputation is not alone sufficient.* These objections are now repeated. I have examined the bill of exceptions, and am unable to perceive that the objections are ill taken in point of fact.

The question, therefore, is, *whether a partnership can be established by general reputation alone.* There are certainly several cases in this court where such evidence has been received without objection at the circuit, as auxiliary to other circumstances properly admissible. Such is *Whitney* v. *Sterling*, 14 *Johns. R.* 215. The court assign as a reason for receiving it, that there was no objection to it on the trial; and when they say the evidence was competent it must be understood that it was so because no objection had been made. Such testimony was again received and acted upon without objection, in *Gowan* v. *Jackson*, 20 *Johns. R.* 176; and the competency of such evidence, even

Halliday *v.* McDougall.

independent of other proof, was mentioned as undoubted, by the late Chief Justice Savage, in *McPherson* v. *Rathbone*, 11 *Wendell*, 98. But the question was not before the court; and the chief justice most probably had in his mind the cases in *Johnson*. Tilghman, Ch. J. said, incidentally also, in *Allen* v. *Rostain*, 11 *Serg. & Rawle*, 373, that general reputation was corroborative evidence, but was not sufficient standing alone. Very likely he made the remark on the authority of *Whitney* v. *Sterling*. Thus, taking those cases and dicta, which go the farthest, if we except the very general remark of Chief Justice Savage, they disallow reputation, except under qualifications, which do not exist in the case at bar. To what principle the distinction between reputation considered alone, and as incidental proof proper in itself, is to be referred, there is some difficulty in saying. Where a partnership has existed in fact, but has been dissolved, and a third person has yet dealt with one of the partners, and sues them all, insisting that he acted on the credit of the former concern, the question whether a partner who has retired shall yet be holden on a contract of the others may depend on his having been known as a partner, for the notoriety of the fact may have influenced the conduct of the plaintiff; and in like manner the notoriety of the dissolution at the time when the plaintiff gave credit, may be evidence against the latter. *Carter* v. *Whalley*, 1 *Barn. & Adolph.* 11. This case was followed in *Bernard* v. *Torrence*, 5 *Gill & John.* 383, 405; but such cases relate to the probability of notice of an admitted fact, to be inferred from public notoriety. To establish the fact itself of a partnership, several cases of very high authority deny that such evidence is receivable even in corroboration of independent proof. Such is the case of *Bryden* v. *Taylor*, 2 *Har. & John.* 396, decided by the court of appeals of Maryland. In the recent case of *Brown* v. *Crandall*, 11 *Conn. R.* 92, the supreme court of errors in Connecticut, after a very learned argument decided, in so many words, that " in an action against two or more persons as partners, general reputation, even in connection with other facts, is inadmissible in evidence to prove a

partnership." White, J. after adverting to the cases and vindicating the rule that hearsay is never admissible of a fact which is ordinarily susceptible of other proof, shews very graphically but truly, the danger in practice of making a decision which should form a precedent for receiving such evidence. " A person of doubtful credit," says the judge, " might cause a report to be circulated that another was in partnership with him, for the very purpose of maintaining his credit. His creditors also might aid in circulating the report, for the purpose of furnishing evidence to enable them to collect their debts." It may be added, that independent of sinister misrepresentations, there is scarcely a question upon which common reputation is more fallible. A contract of partnership is, in its nature, incapable of being defined by laymen ; and whether an apparent partnership be really so, or a contract of some other character, is often a most embarrassing legal question with the ablest lawyer. General reputation of the more ordinary contracts, the legal nature and effect of which are understood by men of business in general, would be a much more proper subject of proof by general report. This the law always rejects; and yet I am not aware that there is a necessity for a resort to such proof in the one case more than the other. The researches of counsel, and of the court, in *Brown* v. *Crandall*, come short of any English case ; and the latest English writers on the law of evidence and partnership, equally fail to furnish any authority for inferring a partnership from what the world may say. So in respect to the fact of dissolution, common report cannot be received. *Goddard* v. *Pratt*, 16 *Pick.* 412, 433. Surely if England with all her commerce, has never let in this mode of establishing a partnership, we want no more evidence that it is at least unnecessary.

The testimony in the case at bar is not open to the observation made in *Whitney* v. *Sterling*, that it was competent because no objection was made. Its introduction was not opposed *in limine*, it is true ; but its utter incompetency to implicate *Wightman*, standing as was alleged, and as we find it did, alone,

Kortwright *v.* Buffalo Commercial Bank.

was repeatedly urged upon the court. The objection was disregarded, and repeated exceptions taken. The proper course would have been to have ordered a non-suit on the motion for that being made, or to have done the same at the close of the testimony, should the judge have thought it a better disposition of the case, than directing a verdict for the defendants.

The court, we think, erred in putting the case to the jury on the question of *McDougall's* connection with *Ansley & Co.*, and especially on that of Wightman's connection with *Ansley, McDougall & Co.* The judgment must, therefore, be reversed; and a *venire de novo* issue from the court below.